NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0338n.06

No. 25-5720

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 28, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | TENNESSEE |
| CHRISTOPHER M. CLOUGH, | ) | |
|     Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: CLAY, MURPHY, and BLOOMEKATZ, Circuit Judges.

MURPHY, Circuit Judge.  Tennessee law requires sex offenders to register a new "primary" residence within 48 hours.  Tenn. Code Ann. § 40-39-203(a)(1).  It defines "primary residence" as a place where a person "abides, lodges, resides or establishes any other living accommodations" for five days in a row.  *Id.* § 40-39-202(12).  The district court in this case revoked Christopher Clough's supervised release because it found that Clough violated this state law by living at a man's apartment for two weeks without registering the address.

On appeal, Clough argues that the court may not have understood Tennessee law because the parties misrepresented that law at the revocation hearing.  And he argues that the government did not present enough evidence to prove that he resided at the man's apartment for at least five days.  Yet the parties' *legal* mistakes do not matter given the court's *factual* finding that Clough lived at the apartment for two weeks.  That finding undisputedly shows a violation of Tennessee

law. And plenty of evidence supported the finding, including statements from the man who let Clough live at the apartment along with corroborating physical evidence. We affirm.

I

In September 2010, Clough raped a young woman in Spokane, Washington. While pretending to be a police officer, he approached this woman, told her that she was in a bad neighborhood, and offered her a ride home. When Clough reached the victim's residence, though, he accused her of drinking while underage and put her in handcuffs. She thought he was arresting her. Clough instead took her to a park and told her: "I am not going to take you to jail, if you give me a piece of you." Rep., R.18, at 12. Fearful for her life, the woman complied with his demands. Clough removed her clothes, raped her, and drove away alone. She made it to a nearby business to call 911. Authorities soon caught Clough.

A Washington state court convicted him of, among other crimes, third-degree rape. The court sentenced him to five years' imprisonment for this crime. Clough's rape conviction also made him a designated sex offender. The court alerted him that he would have to register as a sex offender when he got out of prison and notify the authorities when he changed his address.

Once Clough served his sentence, the State of Washington transferred him to Montana's custody because of preexisting theft charges tied to his issuance of bad checks. But once Montana released Clough from prison, he did not register as a sex offender. He instead became a fugitive from justice, relocating to Johnson City, Tennessee, in 2018.

That year, the federal government indicted Clough for violating the Sex Offender Registration and Notification Act by traveling in interstate commerce and knowingly failing to register as a sex offender. *See* 18 U.S.C. § 2250(a). Clough pleaded guilty in a Tennessee district

2

court. The court sentenced him to 37 months' imprisonment, followed by 240 months of supervised release.

Clough completed this prison term in May 2022. Within six months, however, he had violated several of his supervised-release conditions. Among other things, he did not register his home address or his place of employment and failed to communicate with his probation officer. The district court thus sentenced Clough to 20 more months in prison followed by 220 more months of supervised release.

On July 3, 2024, Clough began his second round of supervised release. He contacted his probation officer within the three-day window for reporting. At this time, he registered himself as homeless. So his probation officer told him to report his location three times a week. He reported as required over the next couple of weeks, continuing to claim that he did not have a home.

Yet the Johnson City police came to suspect Clough of lying. Around 1:00 a.m. on July 24, Clough called the police from the small studio apartment of a man named Mark Phipps. Clough asked to have a woman removed from this apartment because she had been harassing him. An officer visited the apartment around 1:50 a.m. The woman had also been staying there, and the officer allowed her to gather her belongings. Clough later claimed that she had stolen his laptop. The officer's body camera recorded his interactions with Clough at the front door. When they finished their conversation, Clough closed the door and remained inside.

Clough's call to the police drew the interest of Joseph Casey, a police investigator responsible for enforcing Tennessee's sex-offender registry. After watching the officer's body-cam footage showing his interaction with Clough at Phipps's apartment, Casey decided to travel there for a "compliance check" of Clough. Tr., R.67, PageID 728–30, 745. Casey and other officers visited Phipps's home on July 25. Phipps answered the door and told Casey that Clough

3

had gone to "the doctor's office." Video, Hr'g Ex. 2 at 0:03–:05. When Casey asked more about Clough, Phipps stated that Clough had been "living" at his apartment for a "couple weeks." *Id.* at 0:06–:14.

Phipps continued to talk to Casey inside the apartment. During the conversation, Phipps explained that he had met Clough about "two weeks ago" and that Clough had told him he "was homeless" and "needed a place to stay." Phipps Statement, Hr'g Ex. 4. Clough claimed that "his family" had kicked him out of his parents' home after they died. *Id.* Phipps had "back issues and needed help around the apartment," so Clough "would clean and cook for" him and "get groceries" at the store. *Id.* Phipps also let Clough "sleep on the bed" because Phipps's health problems forced him to sleep on the couch. Tr., R.67, PageID 736–37.

While talking to Phipps, Casey examined the area around the bed. He found several bags. Some contained clothes; another contained a spiral notebook. Casey presumed that somebody other than Phipps was living at the apartment because Phipps appeared to store his belongings in a "make-shift closet" by the front door. *Id.*, PageID 742–43. And one of the notebook pages referred to cities where Clough had lived: "Billings" (in Montana) and "Spokane" (in Washington). Notebook, Hr'g Ex. 6.

Clough soon learned of Investigator Casey's visit to Phipps's home. Later that day, he asked his probation officer in a text message why the police were looking for him. A text exchange followed. His probation officer asked whether he had registered. Clough said that he had done so with the caveat: "I slept at a guys house a couple of times to get out of the rain but that's it." Text Messages, Hr'g Ex. 8 at 1. Clough then listed Phipps's address. His probation officer noted that this address was not "registry compliant" because it had "a bunch of stuff around it." *Id.* at 1–2. A day-care center and church were close by. Clough suggested he did not know he had to register

4

a "place" that he "slept at" only "2 times" (but not "back to back"). *Id.* at 1. He said he did not "want to go to jail for something" that he had not done, explaining that he had only "dropped [his] stuff off" at Phipps's home while he was at the doctor. *Id.* at 3. He then reiterated: "I cook for this guy he's old I leave every night around 10 to 11." *Id.* at 4. But he again suggested that he had "only stayed like 2 nights" at Phipps's apartment ("[b]ut not in a row"). *Id.* Ultimately, Clough's probation officer recommended that he clear things up by visiting the Johnson City Police Department. Clough agreed to do so.

As Clough made his way to the police department the next morning, officers arrested him for violating Tennessee's sex-offender registration requirements. Yet state prosecutors later dismissed these state charges against Clough because Phipps died before trial.

In the meantime, Clough's probation officer petitioned the district court to revoke his supervised release a second time. The probation officer asserted that Clough violated five supervised-release conditions. The officer alleged that Clough had violated two mandatory conditions by infringing both federal and state sex-offender registration laws. And the officer alleged that Clough had violated three standard supervised-release conditions by lying to the officer, by living at an unapproved location, and by effectively barring the officer from visiting him at this undisclosed residence.

The parties debated the validity of these allegations at a revocation hearing. The government presented substantial evidence. Investigator Casey and Clough's probation officer testified. The government also introduced body-cam footage from the officer's late-night visit to Phipps's apartment on July 24 and from Casey's visit the next day. And it admitted a photo of the notebook page that referred to Billings and Spokane and the text messages between Clough and his probation officer. Lastly, the government produced a written statement that Phipps signed at

5

his apartment. In response, Clough introduced no evidence. Instead, his counsel argued that Clough may not have been living at Phipps's apartment longer than the two nonconsecutive nights that he admitted to in the text messages.

The district court concluded that Clough violated all five conditions. Its decision largely rested on the same general factual finding. The court found by a preponderance of the evidence that Clough had been living at Phipps's apartment for "two weeks" without alerting his probation officer or registering this address with Tennessee officials. Tr., R.67, PageID 794–95. The court revoked Clough's supervised release and sentenced him to another 24 months in prison and 200 months of supervised release.

II

Tennessee law requires a sex offender to register a new "primary" or "secondary" residence with the proper state officials within 48 hours of "establishing" or "changing" this residence: "Within forty-eight (48) hours of establishing or changing a primary or secondary residence . . . , the offender shall register or report in person, as required by this part." Tenn. Code Ann. § 40-39-203(a)(1). The law defines "primary residence" as "a place where the person abides, lodges, resides or establishes any other living accommodations . . . for five (5) consecutive days[.]" *Id.* § 40-39-202(12). The law defines "secondary residence" as (among other things) "a place where the person abides, lodges, [or] resides" for "fourteen (14) or more days in" a year or "four (4) or more" days in a month (so long as this place is not the person's primary residence). *Id.* § 40-39-202(18). And the law makes clear that the 48-hour window to register excludes "Saturdays, Sundays or federal or state holidays." *Id.* § 40-39-202(32).

Here, the district court found that Clough violated § 40-39-203(a)(1) (and thus his supervised-release conditions) because he had been "staying" or "living" at Phipps's apartment for

"two weeks" without registering this address. Tr., R.67, PageID 793–95. We review the court's general decision to revoke Clough's supervised release for an abuse of discretion. *See United States v. Kontrol*, 554 F.3d 1089, 1091 (6th Cir. 2009). Yet we review any underlying legal conclusions de novo and any underlying factual findings for clear error. *Id.* at 1091–92.

Clough claims that the district court committed both a legal mistake and a factual one when holding that he violated § 40-39-203(a)(1). We start with his legal argument. According to Clough, the parties left the district court with a misimpression of Tennessee law. He is right that the parties did a poor job describing that law. Neither side cited § 40-39-203(a)(1)'s language or discussed the definitions for a home to qualify as a "primary residence" under § 40-39-202(12) or a "secondary residence" under § 40-39-202(18). And some of the parties' statements suggested that they may not have understood the law. For example, Clough's own counsel "read[] . . . the law" to require Clough to "report if he establishes a residence for more than 48 hours." Tr., R.67, PageID 786. But the primary-residence definition requires a person to stay at a location for five days (not two). *See* Tenn. Code Ann. § 40-39-202(12). Similarly, when discussing secondary residences, Investigator Casey suggested that Clough could not stay at Phipps's apartment even for a day because of its proximity to a "day care" (among other sensitive places). Tr., R.67, PageID 757. But the secondary-residence definition requires a person to reside at a location for multiple days. *See* Tenn. Code Ann. § 40-39-202(18).

Ultimately, we find this argument beside the point. Any potential legal misunderstanding would have been harmless because it would not have affected the outcome. *See United States v. Agrawal*, 97 F.4th 421, 429 (6th Cir. 2024). The court did not rest its conclusion on the (mistaken) *legal* ground that Clough could establish a primary residence by living at Phipps's apartment for just two days. Rather, it rested its conclusion on the *factual* ground that Clough had been "staying"

(or "living") at Phipps's home for "two weeks" without registering the address. Tr., R.67, PageID 793–95. And all agree on appeal that Phipps's apartment became Clough's "primary residence" once he stayed there for five straight days. *See* Tenn. Code Ann. § 40-39-202(12). From that point, Clough had "forty-eight (48) hours" to register this address (excluding weekends and holidays). *Id.* § 40-39-203(a)(1); *see id.* § 40-39-202(32). So Clough had, at most, nine days to register—five days to establish a primary residence plus four days to report (assuming that the fifth day of residency fell on a Thursday or Friday). Because Clough remained at Phipps's apartment for two weeks without registering, he violated § 40-39-203(a)(1).

Clough's factual argument fares no better. He asserts that the government did not introduce enough evidence to prove that he resided at Phipps's apartment for the five consecutive days required to make it his primary residence. But he cannot overcome the deferential clear-error standard of review that applies to this factual claim. Under that standard, we must uphold the district court's factual findings so long as those findings represent a "plausible" reading of the record. *United States v. Estrada-Gonzalez*, 32 F.4th 607, 614 (6th Cir. 2022). And we may reverse only if we are "left with the definite and firm conviction that" the court made a factual mistake. *Cooper v. Harris*, 581 U.S. 285, 309 (2017) (citation omitted).

This standard dooms Clough's claim. The district court plausibly found that Clough lived at Phipps's apartment for two weeks. Of most weight, Phipps said in his written statement and during a recorded interview that Clough had been living with him for two weeks. These statements were "absolutely reliable" because Phipps had "no reason to make stuff up." Tr., R.67, PageID 794. In any event, plenty of evidence "corroborated" Phipps's account. *Id.*, PageID 795. Among other things, Clough called the police from Phipps's apartment at 1:00 a.m. on July 24, and a police officer interacted with him there a short time later. Next, Casey found what appeared to be

Clough's notebook next to the bed where Phipps said Clough slept. In text messages to his probation officer, Clough even admitted that the police had searched his "stuff" in the apartment while he was at a "mental health" appointment. Text Messages, Hr'g Ex. 8 at 3. He also admitted that he had spent two (nonconsecutive) nights at the house.

Clough counters that the district court's finding that Clough had "stayed" at the apartment for two weeks could not establish the apartment as his primary residence. Appellant's Br. 26. Clough points out that the primary-residence definition uses the words "abides, lodges, resides or establishes any other living accommodations," not the word "stays." Tenn. Code Ann. § 40-39-202(12). And he reads the Tennessee Supreme Court's decision in *State v. Phelps*, 329 S.W.3d 436 (Tenn. 2010), as holding "that general terms like 'moved' and 'living at' . . . are insufficient to" establish a home as a primary residence. Appellant's Br. 26–27.

This argument has several problems. To start, *Phelps* addressed a different issue. There, the defendant registered his primary and secondary residences in Shelbyville and Murfreesboro, Tennessee. 329 S.W.3d at 439. But he later began regularly visiting his ill father in a different city, spending the night at his father's house "probably once." *Id.* at 442. Prosecutors charged him with failing to register this house in violation of § 40-39-203(a)(1). *Id.* at 439–40. He initially pleaded guilty. *Id.* at 440. But he later moved to withdraw his guilty plea because he had only been visiting his ill father. *Id.* at 441. Although the trial court denied this motion, the Tennessee Supreme Court reversed. *Id.* at 442–43, 452. The court reasoned that the trial court and prosecutor had given only an "imprecise and abbreviated explanation" of § 40-39-203(a)(1) and that the defendant had made only "ambiguous statements" that he was guilty. *Id.* at 450. The trial court had told the defendant that he was charged with having "moved without filling out the proper forms," and the prosecutor had told him that he was charged with "living" at his father's home for

9

about two weeks. *Id.* Yet they never disclosed the "language of the statute" or its requirements. *Id.* The defendant also "expressed his confusion" about the nature of the charge and thought he was "pleading guilty to visiting his father" (not to residing at his father's home). *Id.* In short, *Phelps* held that the defendant might not have understood the nature of the crime. *Id.* at 449–50.

*Phelps* thus says nothing about what evidence plausibly shows that a defendant has "abide[d], lodge[d], reside[d] or establishe[d] any other living accommodations" at a home. Tenn. Code Ann. § 40-39-202(12). And the evidence in this case far surpasses the evidence in *Phelps*. The district court could reasonably find that Clough was not simply "visiting" Phipps (like the defendant in *Phelps*). Rather, Phipps stated that Clough had been "living" at his apartment for two weeks. Video, Hr'g Ex. 2 at 0:01–:16. And Phipps did not just make this conclusory claim. He also listed the activities that Clough had engaged in during this time. For example, Phipps said that Clough "would sleep at [his] apartment" and "would sleep in the bed while [Phipps] slept on the couch." Phipps Statement, Hr'g Ex. 4. And he said that Clough would "clean and cook" and "get groceries" for them to consume. *Id.* Clough himself admitted that he would "cook" for Phipps and keep his "stuff" at the apartment. Text Messages, Hr'g Ex. 8 at 3–4. On these facts, it is at least "plausible" that Clough had abided, lodged, resided, or established living accommodations at the apartment for at least five days in a row. *Estrada-Gonzalez*, 32 F.4th at 614.

Nor do we read *Phelps* as establishing a "magic words" requirement for courts that conduct bench trials on charges under § 40-39-203(a)(1). So Clough gets nowhere with his criticism that the district court stated only that he "stayed" at Phipps's apartment for two weeks. Tr., R.67, PageID 794. This finding adequately conveyed that Clough violated the law. Indeed, the word "stay" means to "continue to be in a place" (as in "stay home") or to "remain or sojourn as a guest or lodger" (as in "stayed at a motel"). *American Heritage Dictionary* 1708 (5th ed. 2011).

Either way, it is largely a synonym for the verbs in the statute. To "abide" is to "dwell or reside" at a place or "remain" there. *Id.* at 3. To "lodge" is to "live" "temporarily" in the place. *Id.* at 1031. And to "reside" is to "live" "permanently or for an extended period" there. *Id.* at 1493. The court's finding encompassed the key idea: Clough used Phipps's apartment as his lodging for at least five days. Besides, the district court also stated that "the evidence" showed that Clough was "living" at the apartment. Tr., R.67, PageID 795. So it found that he had established new "*living* accommodations" there. Tenn. Code Ann. § 40-39-202(12) (emphasis added).

Clough's remaining factual arguments also lack merit. He notes that the district court thought that the woman at the center of Clough's call to the police had "confirmed" that he "had been staying" at Phipps's apartment. Tr., R.67, PageID 796. Clough is right that the court mistakenly recalled the record because no evidence suggests that this woman said anything about Clough's residency. But that error also did not affect the outcome. *See Agrawal*, 97 F.4th at 429. The other evidence more than sufficed to plausibly establish Clough's residency at Phipps's home for two weeks. *See Estrada-Gonzalez*, 32 F.4th at 614. And the court mentioned this woman only as an afterthought. Tr., R.67, PageID 796. So the record leaves no doubt that the court's finding that Clough had lived with Phipps for two weeks did not rest on this mistake.

Lastly, even if the record justifies the finding that Clough stayed with Phipps for two weeks, Clough argues that he did not "knowingly" violate § 40-39-203(a)(1). Appellant's Br. 32–33. True, Tennessee's sex-offender registration laws make it an "offense for an offender to *knowingly*" fail to "timely register" a residence change. Tenn. Code Ann. § 40-39-208(a)(1) (emphasis added). Clough interprets this provision as requiring the government to show that he "*knew*" that "he had 'established a residence'" at Phipps's apartment and had "to report the location within 48 hours." Reply Br. 2–3 (citation omitted). We may assume that Clough reads the law

correctly. Still, whether he "acted 'knowingly'" is a factual question that we review for clear error. *State v. Pruitt*, 415 S.W.3d 180, 205 (Tenn. 2013); *see Kontrol*, 554 F.3d at 1091–92.

And we are not "left with the definite and firm conviction" that Clough lacked the required knowledge. *Cooper*, 581 U.S. at 309. Start with the evidence that Clough knew of his general reporting obligations. In 2019, he pleaded guilty to "knowingly fail[ing] to register or update [his] registration as a convicted sex offender as required by Tennessee law." Factual Basis, R.14, PageID 27; *cf. United States v. Stock*, 685 F.3d 621, 626–27 (6th Cir. 2012). As part of this guilty plea, he conceded that he had "stayed" at a church for "approximately two weeks" without registering. Factual Basis, R.14, PageID 26. Next, Clough continued to violate his reporting requirements after he completed his prison sentence. In 2023, he admitted that he had violated Tennessee's requirement to "update the sex offender registry" within "48 hours of changing residence." Pet., R.45, PageID 309; Judgment, R.50, PageID 317. This time, he failed to update his registration after leaving a motel. Pet., R.45, PageID 309.

Turn to the evidence that he knew he had to register Phipps's apartment. It is apparent that Clough lied to his probation officer when he said that he had "only stayed like 2 nights" there. Text Messages, Hr'g Ex. 8 at 4. As the district court put it: "How about like two weeks because that's what . . . is established here." Tr., R.67, PageID 794. Clough's "efforts to conceal" his living arrangements offers a reasonable basis to "infer[]" his knowledge that he was violating the law by living at Phipps's apartment. *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (citation omitted).

Clough responds by pointing to evidence suggesting that he innocently overlooked his duty to report Phipps's apartment. At some point, for example, he had asked Investigator Casey if he must report a place that he was "coming and going from," and Casey responded in the negative.

Tr., R.67, PageID 754. Similarly, he called the police from Phipps's apartment on July 24 (and seemingly incriminated himself). He also "voluntarily" tried to check in with the police after he learned they were investigating him. Reply Br. 7–8. All this said, the record plausibly supported the district court's contrary inference: that he knowingly tried to conceal his residence at Phipps's apartment. And where there are "'two permissible'—because two 'plausible'—'views of the evidence,'" we must defer to the district court's choice. *Cooper*, 581 U.S. at 299 (citation omitted).

We affirm.